IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| QUARTUS STITT,<br>      Plaintiff,<br><br>v.<br><br>CITY OF DECATUR; DECATUR POLICE,<br>DEPARTMENT; OFFICER DOES 1 through 10,<br>In their official capacity as police officers of the<br>Decatur Police Department, inclusive; DOES,<br>1 through 10, inclusive.<br>      Defendants. | No. 2:22-cv-02138 |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II OF COMPL. PURSUANT TO FED. R. CIV. PROC. 56

NOW COME Defendants, by Jerrold H. Stocks of Featherstun, Gaumer, Stocks, Flynn & Eck, LLP, and for their Motion for Summary Judgment on Counts I and II of Complaint pursuant to Fed. R. Civ. P. 56, they state:

### I. INTRODUCTION

On June 26, 2020, two City of Decatur Police ("DPD") officers conducted a *Terry* stop of less than two minutes the Plaintiff which the Plaintiff alleges deprived him of his Fourth Amendment rights not to be subjected to an unreasonable or prolonged investigatory stop. ( Compl. Count I and II, paragraph 31.). The events commenced less than five minutes before the *Terry* stop when the Central Illinois Regional Dispatch Center ("CIRDC") received a call from a female reporting that she was a victim of a crime involving a gun, in progress, perpetrated by an armed black male suspect at 1360 E. Hickory St., Decatur, IL. who, during the call, drove from the scene in a white Mazda with South Carolina plates. The CIRDC conveyed the preceding information

1

reported by the "female victim" on the DPD radio channel. Moments before the stop, DPD Officer Davis reported on the radio observing a white Mazda car turn northbound onto Lowber after observing it travel from near the reported crime scene. At about 16:52, DPD officer Macomb observed the white car northbound on Lowber at its intersection with Walnut operated by a black male and the white car immediately pulled into an alley off Walnut. Macomb pulled behind the white car, a Mistubishi with FL plates, exited his vehicle, called for back-up and drew his sidearm. Within moments, Officer Davis arrived on scene as backup. The Plaintiff followed commands, exited vehicle, was cuffed, patted, the white car observed in plain view, cleared and the Plaintiff identified, cleared and released. The duration of any "detention" to investigate was less than two minutes.

Defendants seek summary judgment on Counts I and II of the Complaint because the *Terry* stop did not violate Plaintiff's Fourth Amendment rights or, alternatively, the Defendants are entitled to Qualified Immunity. [Counts III and IV previously dismissed]

## II. UNDISPUTED MATERIAL FACTS

1. The call from the female victim to the CIRDC occurred on June 26, 2020. The victim reported an assault in progress by an armed suspect in a white Mazda with out of state plates from South Carolina. (Audio Exhibit D- recording of victim call to CIRDC).

2. The CIRDC is not a department of the City of Decatur or the DPD. (Exhibit 3- City of Decatur Response to First Set of Requests for Admission, para. 2).

3. The DPD officers involved in the *Terry* stop did not hear the telephone call from the female victim to CIRDC. (Exhibit 1, Macomb Declaration, paragraph 15).

2

4. The DPD officers involved in the Terry stop were officer Macomb and officer Davis, n/k/a Butler- Brzycki. (Exhibit 1 and Exhibit 2- Declaration of Kirstin Butler-Brzycki).

5. The information available to DPD officers from dispatch and within DPD relative to the *Terry* stop is recorded on Audio Exhibit C. (Audio Exhibit C; Exhibit 4- Transcription with time lapse data.).

6. The information broadcast by dispatch to DPD officers at or about 16:52 hours detailed response to a white passenger vehicle with out-of-state plates, possibly South Carolina, with a black male driver reportedly possessing a firearm in the vehicle in the area of N Charles St. and E Hickory St. City of Decatur IL arising from an alleged victim report of unlawful use of a weapon. (Audio Exhibit C; Exhibit 1; Exhibit 2).

7. Within seconds after the events of paragraph 6, Officer Davis broadcast on radio that she observed the suspect vehicle, a white Mazda, traveling N on N Lowber St. as it approached E Walnut St. (Exhibit 1, para. 2; Exhibit 2, para.3; Audio Exhibit C).

8. Nine seconds after the events of paragraph 7, Macomb observed a white passenger vehicle traveling N on N Lowber St. at the location Davis reported, as it stopped at the stop sign for E Walnut St. The vehicle was being driven by a black male. (Exhibit 1, para. 4 ; Exhibit 4).

9. Within thirteen seconds of the events in paragraph 8, Macomb pulled behind the white passenger vehicle, followed vehicle to an alley and stopped behind the vehicle. (Exhibit 1, paras. 5 and 6; Audio Exhibit A- Macomb in-vehicle camera).

10.Within 8 seconds of the events of paragraph 9, Macomb unholstered his sidearm and yelled at the black male driver in the white passenger vehicle to show his hands at which time the

3

driver pointed his empty hands and arms out of the driver window. (Exhibit 1, para. 7; Audio Exhibit A and D; Exhibit 4).

11. Within four seconds of the events of paragraph 10, Officer Davis arrived as backup and was out of her car. Macomb then advised the driver to open the driver door and exit the vehicle facing away from Macomb with his hands up. The driver complied with no issues. On Macomb's command, the driver stepped back with his hands up. The driver stepped back in compliance with commands until he was closer to Officer Davis. (Exhibit 1, paras. 7 and 8; Exhibit 2, para 6; Exhibit 4).

12. Once the driver had stopped in between our squad cars, Macomb provided cover while Officer Davis patted the driver down and secured the driver in handcuffs. Officer Davis was patting the driver down professionally. (Exhibit 1, para 9; Exhibit 2, paras 9 and 10)

13. After Officer Davis secured the driver, Macomb cleared the vehicle, observing no passengers or weapons within plain view. (Exhibit 1, para. 10).

14. Officer Davis next identified the driver as Quartus Stitt, date of birth April 7 1996, out of Florida by either examination of his license, radio communication or a combination thereof. (Exhibit 1, para.11; Exhibit 2, para. 11)

15. Officer Davis confirmed with dispatch over the radio that Stitt was not the suspect. Stitt was removed from the handcuffs and released. Shortly thereafter the scene was cleared. (Exhibit 2, para. 11).

16. The duration of the detention of the driver, Stitt, was approximately 2 minutes or less approximating one minute and twenty seconds. (Exhibit 1, para 13; Exhibit 4; Audio Exhibit C).

17. Macomb and Davis executed the stop with the belief based on radio dispatch that the suspect could be armed presenting a high safety risk. (Exhibit 1, para. 15; Exhibit 2, paras. 7 and 8).

18. The location and proximity of relevant events are as follows:

(a). The area indicated as POINT 1 is the location of the reported unlawful use of weapons occurring at or about 1360 E Hickory Street Decatur Illinois.

(b). The area indicated as POINT 2 is the location where officer Davis reported on radio observing the suspect white Mazda on Lowber St. Northbound travelling towards Walnut St. The observation was reported at or immediately before 1652 hours.

(c). The area indicated as POINT 3 is the stop sign at Lowber and Walnut where Macomb first observed the white passenger vehicle at approximately 16:52.

(d). The area indicated as POINT 4 is the location where I stopped the suspect vehicle after it had pulled into a private alley.

(Exhibit 1, paragraph 14, Declaration Exhibit A)

19. Neither Macomb nor Davis communicated directly with female victim. (Exhibit 1, para. 15).

### III. ARGUMENT

The *Terry* stop was reasonable under the circumstances and supported by reasonable suspicion of criminal activity. The information available to the officers described an armed black male suspect leaving the scene of an alleged unlawful use of weapons offense in a white passenger car with out-of-state plates. Plaintiff was a black male operating a white passenger car with out-of-state plates located and stopped by the officers near the crime scene near in time to the reported crime. Presented with information supporting reasonable suspicion that the driver of the white passenger car may be armed, sidearms were drawn, the driver cuffed and patted to control the situation and protect the safety of the officers and public until the passenger car was cleared, the driver was cleared and released from investigatory detention. The duration of the

5

entire encounter between Plaintiff and the DPD officers was less than two minutes. The officers were professional and efficient. The Plaintiff was cooperative. The *Terry* stop did not deprive Plaintiff of his Fourth Amendment rights. Alternatively, the actions of the officers were not contrary to clearly established law which a reasonably objective officer would know was unconstitutional.

   A. No Fourth Amendment Violation

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. A brief investigatory stop may sometimes reasonably be conducted in the absence of a warrant and even of the probable cause required for a lawful arrest. *Terry v. Ohio*, 392 U.S. 1, 20 (1968). An officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion is a common sense, nontechnical conception not readily, or even usefully, reduced to a neat set of legal rules. *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996). An investigatory stop can be justified where the suspect is potentially dangerous. *United States v. Stewart*, 388 F.3d 1079, 1084-85 (7th Cir., 2004). While reasonable suspicion requires more than a hunch, it is satisfied as long as authorities can point to specific and articulable facts which, taken together with rational inferences from those facts provide a particularized and objective basis for suspecting wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The totality of circumstances shows that the decision to stop was justified at inception because the officers had a reasonable and articulable suspicion of wrongdoing afoot and an armed potentially dangerous suspect. See: *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir., 2013); also see collecting cases at FN 1, below.

6

At inception, officer Macomb was advised that the car Plaintiff was driving was a white Mazda based on the report of officer Davis. After initiating the stop, Macomb recognized that the white passenger car was a white Mitsubishi, a similar appearing passenger car. Neither Davis nor Macomb had any information regarding the personal knowledge or competency of the alleged female victim to assess her ability to discern between similar white passenger vehicles with out-of-state plates. The factual judgment that the white passenger car was a Mazda reported by officer Davis was, at most, a mistake of fact, not clearly established law, and does not negate reasonable justification for an investigatory stop of a white passenger vehicle with out-of-state plates with an armed black male driver traveling from the scene of the reported offense near in time to the offense.[1] See: *Id.*at 632-34 (distinguishing mistake of law from mistake of fact). The

---

[1] With respect to the case before us and the requirement for specific and articulable facts, we must assess the totality of the circumstances and the reasonable inferences that may be drawn from it. On this basis, we believe that the police justifiably held a reasonable suspicion that the car and its driver were involved in the bank robbery. While two hours had passed since the robbery and the car was spotted 50 miles west of Eau Claire, these temporal and geographic gaps were not enough to dispel the reasonable suspicion based on the exact match of a unique automobile with a driver fitting the general description of the bank robber. See *United States v. Chapman*, 954 F.2d at 1357 (police stopped vehicle closely matching the description of bank robbery getaway vehicle; however, propriety of stop not at issue); *United States v. Harrington*, 923 F.2d 1371, 1373 (9th Cir.) (reasonable stop of defendant matching general physical description of bank robbery suspect, notwithstanding fact that an hour and ten minutes had passed since suspect last seen by witnesses), cert. denied, 116 L. Ed. 2d 128, 112 S. Ct. 164 (1991); *Creighton v. Anderson*, 922 F.2d 443, 450 (8th Cir. 1990) (reasonable to stop car even though description of getaway car was somewhat different than that of defendant's car); *Thomas v. Newsome*, 821 F.2d 1550, 1553 & n.3 (11th [**10] Cir.) (reasonable suspicion to perform Terry stop even though, when officer saw blue Pinto driven by a black male as described in police bulletin, seven hours had passed since motel robbery), cert. denied, 484 U.S. 967, 98 L. Ed. 2d 401, 108 S. Ct. 461 (1987); *United States v. Longmire*, 761 F.2d 411, 419-20 (7th Cir. 1985) (fours hours after receiving radio dispatch closely matching description of car under surveillance, automobile was stopped and searched for weapons, and reasonable suspicion was not dispelled by fact that dispatch indicated nothing more than the race of the two black females, and failed to indicate that the women were armed). Cf. *United States v. Wilson,* 2 F.3d at 227 (denial of motion to suppress affirmed; police stopped brown station wagon 30 seconds after radio broadcast); *United States v. Maguire*, 918 F.2d 254, 258 (1st Cir. 1990) (probable cause to arrest existed where there was a "tightly forged chain of circumstances," when police officer

court must assess totality of facts and not isolated facts. *United States v. Tilmon*, 19 F.3d 1221, 1225 (7th Cir., 1994).

The *Terry* stop was not unreasonably prolonged. No bright-line rule exists to test the duration for a *Terry* stop. *United States v. Reedy*, 989 F.3d 548, 553 (7th Cir., 2021). The court should examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain. *Id* at 553. Here, the duration for the detention was less than 2 minutes and more accurately one minute, twenty seconds. Detention duration has been deemed reasonable in substantially lengthier duration. *Rabin v Flynn*, 725 F.3d 628 (7th Cir., 2103) (90 minutes); *United States v. Adamson*, 441 F.3d 513 (7th Cir., 2006) (25 minutes). Here, the officers dispelled suspicions quickly, safely and in a controlled manner.

Drawing sidearms was not unreasonable under the circumstances when the officers had a reasonable basis to conclude that the suspect was armed and could present a safety risk to them or the public. *United States v. Patterson,* 25 F.4th 123, 146-48 (2nd Cir., 2022). Drawn sidearms and handcuffs related to a *Terry* stop to control situation and safely effect stop to protect the safety of the officers when the officers had reason to believe that the suspect could be armed did not violate the Fourth Amendment. *Matz v. Klotka*, 769 F.3d 517, 25-27(7th Cir., 2014). "In the recent past, the 'permissible reasons for a stop and search and the permissible scope of the intrusion [under the *Terry* doctrine] have expanded beyond their original contours.[citation omitted]. The last decade 'has witnessed a multifaceted expansion of Terry,' including the 'trend

---

sighted four fleeing bank robbers just two minutes after police [**11] radio dispatch, followed them and arrested them within 17 minutes of first hearing of the robbery), cert. denied, 499 U.S. 950, 111 S. Ct. 1421, 113 L. Ed. 2d 474 (1991). *United States v. Tilmon*, 19 F.3d 1221, 1225.

8

granting officers greater latitude in using force in order to 'neutralize' potentially dangerous suspects during an investigatory detention,' [citation omitted]. For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention." *United States v. Tilmon*, 19 F.3d 1221, 1224-1225 (7th Cir., 1994).

B. Qualified Immunity

The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Green v. Newport*, 868 F.3d 629, 632 (7th Cir., 2017). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably. [citation omitted]. The defense provides 'ample room for mistaken judgments' and protects all but the 'plainly incompetent and those who knowingly violate the law." *Id.* at 632-33. To overcome a defendant's invocation of qualified immunity, a plaintiff must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). If either inquiry is answered in the negative, the defendant official is entitled to summary judgment. *Green v. Newport*, 868 F.3d at 633.

Here, when qualified immunity is asserted, the question becomes not whether reasonable suspicion existed, in fact, but whether the officer had arguable reasonable suspicion to support an investigatory stop. *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir., 2000). A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present still is

9

entitled to qualified immunity. *Id.* at 1165-66. Here, the Plaintiff cannot establish that the alleged Fourth Amendment violation was sufficiently clear that every reasonable public official would understand that what he is doing violated the Fourth Amendment. *Green v. Newport*, 868 F.3d 629, 633 (7th Cir., 2017). Accordingly, qualified immunity supports summary judgment.

CITY OF DECATUR; DECATUR POLICE DEPARTMENT; OFFICER DOES 1 through 10, in their official capacity as police officers of the Decatur Police Department, inclusive; DOES, 1 through 10, inclusive.
Defendants.

By: FEATHERSTUN, GAUMER, STOCKS, FLYNN & ECK, LLP, Their Attorneys.

BY: /s/ Jerrold H. Stocks
Jerrold H. Stocks
ARDC No.: 06201986
FEATHERSTUN, GAUMER, STOCKS, FLYNN & ECK
101 S. State St., Suite 240
P. O. Box 1760
Decatur, Illinois 62523
Telephone: (217) 429-4453
E-Mail: jstocks@decatur.legal

CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Central District of Illinois, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Jerrold H Stocks

Jerrold H Stocks

Jerrold H. Stocks

ARDC No. 06201986
FEATHERSTUN, GAUMER, STOCKS,

FLYNN & ECK, LLP

101 S. State Street, Suite 240

P. O. Box 1760

Decatur, Illinois 62525

Telephone: (217) 429-4453

Fax: (217) 425-8892

E-mail: jstocks@decatur.legal